**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

| | |
|---|---|
| **TIA CORRY**      ) <br>     **Plaintiff**      ) <br>                          ) <br> v.                       ) <br>                          ) <br> **TGI FRIDAYS INC.**      ) <br>                          ) <br>     **Defendant**      ) <br>                          ) | Case No.:   1:18-cv-01299 <br><br> Dated:      February 8, 2019 |

**SECOND AMENDED CIVIL COMPLAINT FOR EQUITABLE AND**
**MONETARY RELIEF AND DEMAND FOR JURY TRIAL**

Plaintiff Tia Corry brings this action pursuant to Title VII of the Civil Rights Act of 1964 and the Americans with Disabilities Act to redress unlawful employment discrimination perpetrated against her by TGI Fridays Inc. ("Fridays"). Specifically, Corry alleges that because of her sex (female), Fridays subjected her to sex-based harassment, sexual harassment and a hostile work environment, failed to take corrective action on her complaints of these Title VII violations, and retaliated against her for complaining of these Title VII violations. Corry further alleges that, in violation of the ADA and its amendments, Fridays failed to accommodate her disability and retaliated against her for requesting and using a reasonable accommodation.

**JURISDICTION AND VENUE**

1.    This Court has subject matter jurisdiction over the claims raised herein against Fridays pursuant to Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e-5(f)(3). Subject matter jurisdiction also exists pursuant to 28 U.S.C. § 1331, as this action arises under the laws of the United States, thereby presenting a federal question.

2. Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) and 42 U.S.C. § 2000e-5(f)(3), as Fridays employed Corry in Fairfax County, Virginia, which is where the acts complained of herein took place.

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

3. On about April 2, 2018, Corry filed a Charge of Discrimination on the basis of sex, disability, and retaliation with the United States Equal Employment Opportunity Commission. In her EEOC Charge, Corry set forth the facts described below in paragraphs 11 through 64.

4. One hundred and eighty days after April 2, 2018 was October 1, 2018.

5. On January 2, 2019, Corry sent a letter, by the United States Postal Service and by facsimile, asking the EEOC to issue her a Dismissal and Notice of Rights.

6. On February 8, 2019, Corry received from the EEOC her Notice of Right to Sue, attached hereto as Exhibit A, upon the claims set forth in her Charge of Discrimination.

7. Accordingly, Corry has exhausted her administrative remedies and timely filed her complaint.

## PARTIES

8. Corry is a 31 year old female resident of Washington, D.C.

9. Throughout Corry's employment with Fridays, it has been aware of her sex (female).

10. Fridays has had more than fifteen employees in each of the last twelve months.

11. Throughout the time period relevant to this complaint, Corry was an "employee" of Fridays, and Fridays was Corry's "employer" for purposes of Title VII and the ADA.

## FACTUAL ALLEGATIONS

12. Corry first worked for a Fridays restaurant when she was fifteen years old for two to three years at Ronald Reagan Washington National Airport then worked in Rockville, Maryland as hostess and a server.

13. Corry enjoyed her early work at Fridays restaurants very much because of the inviting atmosphere of the restaurants, the happy staff, the great morale, and the excellent leadership from management.

14. When Corry was searching for new work in 2016, she jumped at an opportunity to work for Fridays. In December 2016, Corry returned to Fridays as a Service Manager. Corry trained for seven weeks at the Tysons Corner location. Beginning in about February 2017, Corry worked for about three months at the 4650 King Street location as Service Manager. Corry then transferred to Fridays' Hybla Valley location at 6640 Richmond Highway Alexandria, Virginia, also working as Service Manager.

15. The essential functions of Corry's position, Service Manager, were managing the front of house staff, including the hosts, servers, and bussers; preparing schedules; coordinating and conducting training for new employees; facilitating menu rollouts; conducting safe counts, deposits, and Garda pickups; opening and/or closing the restaurant; ensuring drinks were made to recipe and conducting pour tests for bartenders; ensuring that the eleven step flow of service was met; and managing mystery shops.

16. As Service Manager, Corry was paid on a salaried basis and was scheduled to work fifty five hours a week. However, she frequently worked more than fifty five hours a week.

17. When Corry arrived at the Hybla Valley restaurant, she reported to Mike Lloyd, the Kitchen Manager and Acting General Manager. Jemore (also known as Jay) Davis, the permanent General Manager, joined that restaurant in late April 2017. When Davis became the permanent GM, he frequently had Corry do packet work with new hires, and made her responsible for hiring and firing employees. Corry's working hours typically overlapped with Davis's working hours in part.

18. In the middle or end of April 2017, Davis approached Corry and asked her to help him find a brunch spot for his upcoming wedding anniversary. When Corry suggested a few places in the District of Columbia, Davis suggested that they go together to try out the restaurants. Corry understood Davis to be asking her to go on a romantic outing with him and declined.

19. In May 2017, Corry stopped by the restaurant, not in uniform, on a day off, because she left her credit card there the night before. Davis told Corry she was "looking sexy" and that he "loved" her "toes and feet." On another occasion in that same time frame, Davis asked Corry to sit down to talk. Davis told Corry that his wife cheated on him and that he was leaving her.

20. Corry told Davis that she was sorry to hear such horrible news but that she was not interested in hearing any more. Davis then grabbed Corry's hand, and she snatched it away. Corry told Davis that she is a lesbian and does not like men. Corry also told Davis not to touch her any more.

21. On May 13, 2017, a bar fight occurred in the restaurant. Corry was punched in the face, hit in the back with a cocktail table, and was injured. Corry called Davis to report what had happened and to ask him to come to the store. An ambulance came, but Corry was not able to leave until Davis arrived. When Davis arrived, he gave Corry an intimate hug as if he were her husband instead of her boss and kissed her on the cheek.

22. Corry's injuries as a result of the May 13, 2017 incident included a lower back injury, which inflamed a nerve connected to her left leg. As a result of the injuries she sustained at work on May 13, 2017, Corry became unable to, *inter alia*, stand for long periods of time, lift heavy items, and walk continuously.

23. Because of the injuries she sustained as a result of the May 13, 2017 incident, Corry was out of work until July 12, 2017. When Corry returned, to accommodate her disabilities, she was only supposed to work thirty hours a week (with a maximum of six hours a day) as opposed to her typical fifty five. Also to accommodate her injuries, Corry was supposed to have a ten pound lifting limit and a short break every thirty minutes to stand and stretch. Corry was also supposed to be limited to completing sedentary work.

24. Fridays was aware of Corry's disabilities and approved these accommodations prior to Corry returning to work.

25. Beginning on July 12, 2017, Corry's pay was reduced to reflect her decreased working schedule.

26. During the first two weeks after Corry's return to work, although her accommodations were approved, Fridays did not adhere to them.

27.     When Davis saw Corry for the first time after she returned to work, he hugged her very tightly and caressed her lower back.  Corry pushed him off of her and told him he was being inappropriate.  Davis told Corry that she was overexaggerating and that she needed to relax.

28.     Upon Corry's return to work, she was often scheduled for the 8:00 p.m. to 2:00 a.m. shift.  In about October 2017, she began receiving more day shifts.  The late night shift was not an ideal time to accomplish sedentary work because it is during that time frame when the restaurant is busiest.  Additionally, Davis frequently left Corry alone in the store without other managers present, limiting her ability to leave for appointments or at the conclusion of her six hours, and tried to make Corry work double shifts.  Corry complained to Ricky Shickle, the District Operations Manager, who informed Davis that it was imperative Corry stick to her six hour a day limitation. However, Corry's accommodations were not adhered to after Shickle's email either.

29.     Corry complained to KC Cunningham, the HR Director, regarding these scheduling issues in about August 2017.  Cunningham told Davis that Davis could not refuse Corry's leave requests for medical appointments and that Davis could not schedule her for double shifts.  Corry's scheduling issues improved slightly, but not permanently, for a short period thereafter.  Corry complained to Cunningham regarding this issue again in October 2017.

30.     Upon Corry's return after the May 2017 bar fight, Davis touched Corry inappropriately on multiple occasions and subjected her to sexist comments.  Corry also witnessed Davis subjecting other employees to a hostile work environment because of their sex.

31.     When Corry would arrive at work, or would leave for the day or evening, Davis would frequently hug her and caress her lower back.  Corry told Davis repeatedly that she felt

6

uncomfortable and did not want him touching her. However, Davis deflected Corry's protests by continuing his conduct or by stating "It's ok, I know you like women."

32. On several occasions Corry's friends visited the restaurant. Davis made jokes based on sexual orientation to Corry's friends and would flirt with them.

33. Also on several occasions, Davis told Corry that she could not hired qualified candidates for the bar area if they were not "cute," had nice looks, nice "butts," or nice "boobs." Corry did not welcome Davis's comments or conduct and found it offensive.

34. Corry complained about Davis's comments and conduct to Mike Lloyd, the restaurant's Kitchen Manager, upon her return from leave. Corry reported to Lloyd that Davis and E.J., an associate manager, would seclude themselves in the office while being overly affectionate with each other, despite the fact that Davis was married.

35. Davis and E.J. had begun behaving inappropriately fairly quickly after Davis joined the restaurant. For example, early in Davis's tenure at the restaurant, during a manager's meeting, E.J. told Corry she was going to sit next to her "Daddy," referring to Davis. E.J. also began speaking for Davis at those meals.

36. As time passed, E.J. and Davis began spending time together outside of work. Davis gave E.J. and her friends favorable schedule placements more frequently than he did for other individuals. They frequently touched each other in the restaurant. When they were in the manager's office together, they would block the windows in the door with paper. E.J. would spend time with Davis in the office when she was already off the clock. E.J. also would sit on Davis's lap in the restaurant. Kitchen staff complained that Davis was neglecting the kitchen to be in the office with E.J.

37. Corry also reported to Lloyd that Davis offered E.J. $900.00 for her birthday trip if she would date him because he and his wife were divorcing.

38. Corry told Lloyd that because of Davis's and E.J.'s conduct, she felt uncomfortable working on shifts with them. Lloyd told Corry that he would speak with Davis, but noted that he really did not want to be involved in the situation.

39. Female team members complained to Corry about managers being inappropriate with them. One employee, "N.," complained to Corry that Davis rubbed her "ass" when she was in the office and that she was concerned that the only way she was going to get a bartender position would be if she acquiesced to Davis's treatment of her. A server, "T.," complained to Corry about Davis's and E.J.'s conduct. T. was a younger employee with strict parents, and Davis's and E.J.'s conduct made her feel uncomfortable. A cook, "R.," complained to Corry about Davis hugging her.

40. Another female employee complained that Davis smacked E.J. on the behind in the kitchen and played with E.J.'s hair in front of others. That employee also complained that Davis made inappropriate comments regarding servers and customers.

41. In early to mid August 2017, Davis repeatedly demanded hugs from female employees. Corry also learned from "K.", a host, that Lloyd had grabbed her by her scarf by both hands and pulled her toward him for a hug or kiss. K had complained to Davis regarding Lloyd, but Davis did nothing.

42. During the week of August 16, 2017, Corry went to TGI Fridays' Tysons Corner location to pick up her food handler certificate. While there, she ran into Ken Eisig, a Regional District Operations Manager.

43. Corry asked Eisig if she could speak with him about concerns at her restaurant. Corry told Eisig that she was very uncomfortable with the relationship between Davis and E.J. and that she felt harassed when Davis was there because he was constantly hugging her (Corry) and kissing her on the cheeks. Corry also discussed safety concerns at the restaurant.

44. Eisig told Corry that what she was saying was very alarming and assured her that he would speak with Shickle. Eisig also asked Corry to email Shickle because he was Corry's District Operations Manager.

45. On August 21, 2017, Corry requested a meeting with Shickle. On August 23 or 24, 2017, Shickle came to the restaurant and met with Corry. J.P. Pons, the General Manager of a Fredericksburg, Virginia restaurant, met with Corry as well.

46. Corry told them that she was uncomfortable with the relationship between Davis and E.J. and that she felt harassed when Davis was there because he was constantly hugging her.

47. Corry also expressed concern about a guest groping her and buying her gifts despite her protests. Corry told them that when she complained to Davis about the guest, he said "Well does he have money? Most Africans have money."

48. Pons stopped Corry and said "Hey, guests harass us guys, but you just have to ignore them or get a stay away order on your own, but Fridays isn't responsible."

49. Corry reiterated that she was not ok with Davis's hugs and that she was not comfortable working with him. Corry cried throughout this conversation.

50. Shickle dismissed Corry's complaints and told Corry that he was not interested in hearing "the noise" and that she was looking at it "all wrong." Shickle then completely changed the subject, criticizing Corry for staffing issues at the restaurant.

51. Corry then reported to Shickle that Davis told her not to hire certain people because of their looks.  In response, Shickle stated "Well, don't you want good looking people at your bar?"  At that point, Corry stopped the conversation and thanked them for their time because Shickle was not taking her concerns about Davis and her work environment seriously.

52. After the conversation with Shickle, Corry then began facing unwarranted threats of write-ups because of staffing issues in her restaurants and Corry's work environment did not improve.

53. Further, between July 2017 and September 2017, Davis began assigning some of Corry's work to E.J. due to Corry's complaints to him about how he treated her and/or touched her.  Davis would tell Corry "I'll just have [E.J.] do the project since you're so sensitive."

54. Around October 12, 2017, Corry complained to Lloyd again about Davis's conduct.  Lloyd told Corry not to think much of it and to sit down with Davis to discuss it.  That same day, Lloyd made inappropriate comments regarding "A.R.," a new hire. Lloyd called her his "little mami" and said they couldn't let her "get away." Lloyd subsequently made many comments to Corry about A.R.'s appearance.

55. On October 18, 2017, Lloyd texted Corry to tell her that A.R. had been sent home the previous day and had not begun her training. When Corry asked E.J. why A.R. had been sent home, E.J. told Corry that she did not want A.R.'s "big booty" working with "her Daddy," referring to Davis, when E.J. was not there as well.

56. By this time, Corry had also become concerned because Davis's relationship with E.J. was disturbing other female team members, including a server, bartenders, a cook, and a host.  Corry also received reports from other team members that E.J. was unfair to them because Davis flirted, unsolicited and unwanted, with them.

10

57. On October 31, 2017, Corry called Eisig and again reported her concerns about Davis. Corry reported that she and others still had concerns about Davis's inappropriate relationship with E.J. Corry also told Eisig that she could not take being touched and verbally harassed any more. Corry complained about Davis calling her "baby," telling her she had "sexy toes," and commenting on and playing with her hair. Eisig again told Corry to speak with Shickle regarding her concerns.

58. Corry told Eisig that Shickle had brushed her off and that she needed to reach out to someone higher. Eisig told Corry that he was going to report her concerns to Cunningham and that Corry should call her as well. Corry left Cunningham messages that day as well as the next.

59. On November 1, 2017, Davis did not speak to Corry at all during her shift.

60. Then, on November 2, 2017, Corry was able to speak with Cunningham. Corry began to speak, but Cunningham cut her off immediately and said "Hey, been meaning to call you back. This just isn't working anymore at the store. You know they just really need some one that is going to be there full time and Jay said he can't work with your part time schedule anymore."

61. Corry asked Cunningham "So am I fired?" Cunningham then stated "No, we're just putting you on LOA until you can work full time again." Corry asked when her leave started and asked if Cunningham had spoken with Eisig. Cunningham responded "Yes, and we are investigating, but today will be your last day and I'll contact worker's comp to let them know."

62. On November 17, 2017, Corry contacted Cunningham again because two female employees reached out to her to tell her that staff had recorded Davis and E.J. kissing and groping each other in the prep area. Cunningham told Corry that an investigation was already open and ended the call.

63. About two weeks later, a female bartender called Corry to tell her that she also had made a complaint of harassment over how she was being touched and about how she was being treated when she rejected Davis's advances.

64. To date, Corry has received no further response from Cunningham or anyone else in Human Resources, or any of her managers, regarding her complaints after her return to work in July 2017.

65. On March 7, 2018, Corry reported her concerns about Fridays' discrimination, retaliation, failure to accommodate her disability, and the facts set forth above to Duncan Davis, Fridays' Vice President of Operations and demanded to be returned to work, with her previous accommodations in place.

## COUNT I
## 42 U.S.C. § 2000e-3
## Hostile Work Environment Based on Sex/Sexual Harassment

66. Corry hereby incorporates all allegations set forth in all the forgoing paragraphs as though fully realleged herein.

67. During her employment, Fridays subjected Corry to a hostile work environment because of her sex (female).

68. Fridays subjected Corry to numerous harassing and unwelcome actions that pervaded her work environment.

69. Corry did not welcome the harassing conduct.

70. The harassing conduct was perpetrated because of Corry's sex.

71. Corry subjectively found her work environment to be hostile as a result of the harassing conduct.

72. A reasonable person would have found Corry's work environment to be hostile as a result of the harassing conduct.

73. Fridays was aware of the incidents alleged throughout this complaint that comprise a hostile work environment as those incidents were occurring or shortly after the incidents occurred.

74. The harassment was so pervasive and open that a reasonable employer would have had to be aware of it.

75. Fridays did not exercise reasonable care to prevent harassment in the workplace on the basis of sex and did not exercise reasonable care to promptly correct any harassing behavior that does occur.

76. Fridays did not stop or remedy the conduct toward Corry, despite having knowledge of that conduct and despite Corry's complaints about that conduct.

77. The harassment that Corry suffered was sufficiently pervasive so as to interfere with her work performance, alter the conditions of her employment, and create a hostile or abusive atmosphere.

78. Fridays unlawfully discriminated against Corry with respect to the terms, conditions and privileges of employment, on account of her sex, by not offering or allowing her to work in a professional environment free from discrimination.

79. Fridays has no legitimate business reasons for the actions to which it subjected Corry. Any stated reasons for the hostile work environment Corry was subjected to are pretext for harassment.

80. The harassing conduct and Fridays' failure to stop it caused Corry injuries in the form of humiliation, embarrassment, loss of employment, loss of enjoyment of life, as well as other emotional distress, pain, and suffering.

81. Corry is entitled to such legal or equitable relief as will effectuate the purposes of Title VII, including but not limited to economic, compensatory, and punitive damages, as well as reasonable attorneys' fees and costs.

## COUNT II
### 42 U.S.C. § 12112 (Failure to Accommodate)

82. Corry hereby incorporates all allegations set forth in all the forgoing paragraphs as though fully realleged herein.

83. During the timeframe relevant to this Complaint, Corry had a disability as set forth in 42 U.S.C. § 12102 in that she had a physical impairment that substantially limits one or more of her major life activities.

84. During the timeframe relevant to this Complaint, Fridays had notice of Corry's disabilities.

85. During the timeframe relevant to this Complaint, Corry requested reasonable accommodations to accommodate her disability and to allow her to continue working for Fridays, despite her disabilities.

86. With reasonable accommodations, Corry could perform the essential functions of her position, despite her disabilities.

87. Fridays granted Corry reasonable accommodations.

88. Fridays did not fully observe or honor Corry's reasonable accommodations.

89. During the timeframe relevant to this Complaint, Corry was meeting Fridays' expectations of her performance.

90. In discriminating against Corry in violation of the ADAAA, Fridays evidenced malice, spite, and ill will; its actions were willful and wanton; and evinced a conscious disregard for Corry's rights.

### COUNT III
### 42 U.S.C. § 2000e-3 (Title VII Retaliation)

91. Corry hereby incorporates all allegations set forth in all the forgoing paragraphs as though fully realleged herein.

92. During her employment with Fridays, Corry engaged in multiple instances of protected activity under Title VII by complaining of sex discrimination and/or sexual harassment.

93. Fridays knew of each instance of Corry's protected activity.

94. Fridays unlawfully subjected Corry to and tolerated adverse actions against Corry because of her complaints of violations of Title VII during her employment with Fridays.

95. Fridays did not investigate Corry's complaints about violations of Tile VII.

96. Fridays did not stop or remedy the conduct toward Corry, despite having knowledge of that conduct and despite Corry's complaints about that conduct.

97. Fridays has no legitimate business reasons for the adverse actions it has taken against Corry.  Any stated reasons for the adverse actions against Corry are pretext for retaliation.

98. The adverse actions at issue in this complaint occurred under circumstances that raise a reasonable inference of unlawful retaliation based on Corry's protected activity.

99. Corry has sustained damages as the result of Fridays' illegal retaliation, including, but not limited to, lost wages, lost bonuses, damage to her career, and emotional, mental, and physical distress.

100. Corry is entitled to such legal or equitable relief as will effectuate the purposes of Title VII, including but not limited to economic, compensatory, and punitive damages, as well as reasonable attorneys' fees and costs.

## COUNT IV
### 42 U.S.C. § 12101, *et seq*. (ADAAA Retaliation)

101. Corry hereby incorporates all allegations set forth in all the forgoing paragraphs as though fully realleged herein.

102. During her employment with Fridays, Corry engaged in multiple instances of protected activity under the ADAAA by requesting a reasonable accommodation for her disabilities, using a reasonable accommodation, and complaining that her reasonable accommodation was not being honored.

103. Fridays knew of each instance of Corry's protected activity.

104. Fridays unlawfully subjected Corry to and tolerated adverse actions against Corry because of her protected activity under the ADAAA.

105. Fridays did not investigate Corry's complaints about violations of the ADAAA.

106. Fridays did not stop or remedy the conduct toward Corry, despite having knowledge of that conduct and despite Corry's complaints about that conduct.

107. Fridays has no legitimate business reasons for the adverse actions it has taken against Corry. Any stated reasons for the adverse actions against Corry are pretext for retaliation.

108. The adverse actions at issue in this complaint occurred under circumstances that raise a reasonable inference of unlawful retaliation based on Corry's protected activity.

109. Corry has sustained damages as the result of Fridays' illegal retaliation, including, but not limited to, lost wages, lost bonuses, damage to her career, and emotional, mental, and physical distress.

110. Corry is entitled to such legal or equitable relief as will effectuate the purposes of the ADAAA, including but not limited to economic, compensatory, and punitive damages, as well as reasonable attorneys' fees and costs.

## PRAYER FOR RELIEF

WHEREFORE Corry prays this Honorable Court for judgment against Fridays and respectfully requests that the Court order Fridays to develop an auditing process to assist the Corporation with identifying and addressing actual or potential sexual harassment and disability discrimination; to provide antidiscrimination and sexual harassment training to all regional directors, general managers, assistant general managers, assistant managers, and service managers; and to report to the EEOC all complaints of sex-based conduct or comments made by employees. Corry further prays that this Court award her reinstatement to her position; injunctive relief; economic damages including back pay and front pay; compensatory damages; punitive damages; reasonable attorneys' fees and costs; prejudgment interest; and any other relief that this Court deems just and equitable.

## DEMAND FOR JURY TRIAL

Corry demands a trial by jury on any and all issues proper to be so tried.

Respectfully Submitted,

/s/ Andrea M. Downing
Andrea M. Downing
VSB No. 79584
Attorney for Plaintiff Tia Corry
Wade, Grimes, Friedman,

            Meinken & Leischner, PLLC
            616 North Washington Street
            Alexandria, Virginia 22314
            (t) 703-836-9030
            (f) 703-683-1543
            downing@oldtownlawyers.com

**CERTIFICATE OF SERVICE**

  I hereby certify that on the 8th day of February 2019, a true and accurate copy of the foregoing document was filed electronically via the Court's CM/ECF electronic filing system which will send a notice of electronic filing to the following counsel of record:

  Joseph E. Schuler, Esq.
  Jackson Lewis, P.C.
  10701 Parkridge Boulevard, Suite 300
  Reston, Virginia 20191
  *Counsel for Defendant*

            /s/ Andrea M. Downing
            Andrea M. Downing